**Anne ANDERSON, et al., Plaintiffs,**

v.

**BEATRICE FOODS CO., Defendant.**

**Civ. A. No. 82–1672–S.**

United States District Court,
D. Massachusetts.

July 7, 1989.

Jan Richard Schlichtmann, Schlichtmann, Conway & Crowley, Boston, Mass., for plaintiffs.

Jerome P. Facher and Neil Jacobs, Hale & Dorr, Boston, Mass., for Beatrice Foods.

Mary Ellen Ryan, Nutter, McClellan & Fish, Boston, Mass., for John J. Riley Co.

## FINDINGS PURSUANT TO REMAND ON THE NATURE OF THE DEFENDANT'S MISCONDUCT

SKINNER, District Judge.

This case was remanded by the court of appeals for further hearings on the plaintiffs' motion for a new trial. The court of appeals has retained jurisdiction over the motion itself but has directed me to report my findings and recommendations. *Anderson v. Cryovac, Inc.,* 862 F.2d 910 (1st Cir.1988). The history of the case is fully set out in the opinion of the court of appeals and I shall not restate it. The plaintiffs seek a new trial under Fed.R. Civ.P. 60(b)(3) on the ground that two relevant reports concerning the tannery property had not been disclosed during pretrial discovery. The procedural history of the discovery process is reported in detail in my memorandum and order dated January 22, 1988, a copy of which is appended hereto. I concluded that the defendant had been obliged to make full inquiry of the various Riley companies under the terms of the agreement under which it resold its former Riley Leather division, which included the tannery and the adjacent 15 acre tract, to John J. Riley and his several corporations. If it had done so it would have discovered the existence of these two reports and would have been required to describe them in answers or supplementary answers to successive interrogatories propounded by the plaintiffs.[1] I concluded that this omission was an error of judgment, but found no evidence of fraud. It was my opinion that the reports were basically favorable to the defendant and that the failure to identify them was not likely to have affected the outcome of the trial or to have substantially impaired the plaintiffs' ability to prepare their case. With respect to all of these issues I imposed upon the plaintiffs the burden of proof by

---

1. The most recent hearing revealed the existence of a number of other relevant documents, which would have been discovered upon dili-gent inquiry and, although of varying significance, should have been revealed.

**2**

clear and convincing evidence. *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir. 1978).

In its opinion ordering remand the court of appeals refined the rules governing the burden of proof in the following manner. The moving party must establish the existence of "misconduct" by clear and convincing evidence. If it does so, and also by the same burden of proof establishes that the misconduct was intentional, "as where concealment [of evidence] was knowing and purposeful," 862 F.2d at 925, the movant is entitled to a presumption that the misconduct substantially interfered with the movant's preparation of its case. (Clearly the court intended the same rule to cover actual fraud and misrepresentation as well.) This presumption may only be overcome by clear and convincing evidence to the contrary. If, on the other hand, the moving party proves no more than that the misconduct is accidental or inadvertent, the moving party must carry the burden of proving substantial interference by a preponderence of the evidence.

The court of appeals determined that the defendant's failure to reveal the existence of these reports constituted misconduct. The matter has been remanded to me (1) to conduct more comprehensive hearings on the defendant's state of knowledge and intent, and in particular to permit inquiry of the defendant's principal attorneys; then (2) to make findings as to the nature of the defendant's misconduct in order to determine what presumptions or burden of proof should be applied to the issue of substantial interference; next (3) to "receive an orderly presentation" and to make a finding on the issue of substantial interference; and finally (4) to make a recommendation to the court as to "whether plaintiffs are ... entitled to any remedy, and if so the nature and scope thereof ... [and] the appropriateness *vel non* of sanctions anent any unexcused discovery violations." 862 F.2d at 932.

Hearings were held on seventeen different days from January 31 to March 17, 1989. I heard the testimony of 22 witnesses and received 236 exhibits totalling over 2800 pages. Attorneys Jerome Facher and Neil Jacobs, counsel for the defendant, testified on behalf of the defendant. Mr. Facher was not cross-examined by plaintiffs' counsel. Attorney Mary Ryan, counsel for the Riley interests, submitted an affidavit in lieu of testimony by agreement. Briefs of the parties were filed on April 5, 1989.

Attorney Facher testified that he had no part in the drafting of the agreement between Beatrice and Riley for the resale of the tannery to Riley. He was concentrating on the other aspects of this complex case and paid little attention to it. In his opinion the agreement did not have the significance ascribed to it by me and later affirmed by the court of appeals. He was shown the report from Yankee Engineering briefly on January 9 or 10, 1986, but considered that it was Ms. Ryan's responsibility and not a significant document in any case. At the time the plaintiffs had set a frenetic schedule of depositions which engaged his entire attention. He never intended deliberately to withhold any information from the plaintiffs.

I have no reason to doubt his testimony. Mr. Facher is a trial lawyer of national reputation whose work I have observed in this court on a number of occasions. He has been well known locally for many years as a tough but meticulously ethical advocate.

Mr. Jacobs' testimony was substantially the same as Mr. Facher's, except that he learned of the GEI report at an earlier date through his associate, Mr. Frederico. In addition, prior to the Foley deposition, Mr. Jacobs had a conversation with Ms. Ryan about the GEI report and some other documents in connection with the work product privilege, but considered invocation of the privilege to be Ms. Ryan's prerogative and responsibility. He did not consider the report to be significant. Indeed, the GEI report standing alone is quite innocuous, even though under my ruling and that of the court of appeals it should have been revealed in answers to interrogatories. He testified that he was primarily concerned with other aspects of the case and that he

never intended to deliberately conceal any evidence. While his reputation is not as well established as Mr. Facher's, I have no reason to doubt his testimony either. These attorneys provided a huge volume of potentially inculpatory information to the plaintiffs, and, in my opinion, it has not been established by clear and convincing evidence that either Mr. Facher or Mr. Jacobs deliberately concealed the reports or any other evidence.

Plaintiffs have insisted, however, that Beatrice was engaged in a general conspiracy to prevent the plaintiffs from obtaining the evidence they needed to prosecute their case, evidenced by the resale to Riley of the tannery and the adjacent land. The uncontradicted evidence is that the resale was part of a general plan by Beatrice to divest itself of its unprofitable smaller divisions. The perspicacity of this business judgment is apparent from the fact that the tannery closed December 31, 1988, writing *finis* to the tanning industry in New England. Moreover, the plaintiffs have successfully argued, I have held and the court of appeals has affirmed that the agreement of resale imposed upon Beatrice the same obligation to respond to discovery that it would have had if it had retained the Riley property as a division. The problems of this case have arisen in part because the defendant's trial lawyers did not appreciate the full impact of the agreement. (In fairness it should be said that until my order of January 22, 1988, there was no authoritative interpretation of the discovery obligations arising under such an agreement. It would be a pernicious rule indeed if legal opinions later found to be erroneous were to be equated with fraud. There would be nobody left in the legal system except the justices of the Supreme Court.)

As further evidence of such a conspiracy the plaintiffs offered considerable evidence of removal of material from the 15 acre tract. With the exceptions hereinafter noted I find it probable that this removal activity was legitimately connected to the drilling of test wells and other investigative procedures that were carried on from 1980 until the time of trial. I do not find credible the testimony of plaintiffs' witness

Robbins that there were mounds of blue leather scraps on the 15 acres in 1982 which have since disappeared. In my view it is not likely that such unusual material, even in residual amounts, could have escaped the notice of the platoons of investigators representing the E.P.A. and the parties who have climbed all over this property since 1980. I find the witness O'Doherty to have been a sincere but highly suggestible witness in whose capacity to accurately observe and remember events of 1983 I have little confidence.

Robbins also testified that he recognized an abandoned truck body on the 15 acres as being the remains of a truck formerly used by the tannery. The truck is no longer there. Plaintiffs attribute some significance to this, as evidencing concealment of a practice of the tannery to dump its trash on the 15 acres. The relevance of this testimony, even if it were true, appears remote in the context of a chemical pollution case.

In 1981, or thereabouts, Mr. Riley directed a tannery employee named Sorenson to clean up assorted junk, including scrap iron and abandoned truck bodies, from the 15 acres. This may have been done in anticipation of an inspection by the E.P.A., but in any case was prior to the institution of the present action. In August of 1983 Mr. Riley directed a tannery employee named Granger to conduct a clean-up of the 15 acres, but not to disturb any "evidence." Riley told Granger "the less people knew about it the better ... because we were just preparing for [the E.P.A.] coming in on the property, and to keep it quiet." Granger did keep it quiet insofar as it was possible to do so working with a diesel front end loader and a dump truck in broad daylight, with representatives of the E.P.A. present on the property.

In late August or early September, 1983, Granger and Sorenson discovered a small pile of reddish-brown "peatlike" material about three cubic yards in volume near the southern boundary of the 15 acres. Riley was very upset when he saw it, so Granger and Sorenson dug up the pile and carted most of it away to a dumping area above

the tannery. Granger covered the remaining material with leaves. A fairly substantial amount of the material remained, however, and was discovered by the plaintiffs during their inspection of the property. One sample of this material, moreover, contained a substantial concentration of trichloroethylene, one of the complaint chemicals. Plaintiffs introduced this sample at trial and asserted that it was sludge from the tannery's sedimentation tank. All of the tannery personnel who were called as witnesses, except Granger, testified that this material bore no resemblance to anything that they had ever seen on the tannery property. Granger testified that the material looked like tannery sludge but did not smell like tannery sludge, which smelled strongly of manure. I compared samples of this material with samples of tannery sludge both at the trial and during the recent hearings and found them totally different in color, consistency and odor.

In the recent hearings the plaintiffs took the position that this material consisted of "tailings" from the tannery, i.e., fatty fiber scraped from the inside of cowhide during the tanning process, to which it bore superficial resemblance. At my insistence the material was finally subjected to chemical analysis. On the basis of the resulting expert testimony, I am satisfied that this material is in fact a residual by-product of the manufacture of polyvinyl chloride, a common plastic often used for water and sewer pipes and having no connection whatsoever with the tanning of leather.[2] It was presumably dumped on the 15 acres by one of the neighboring chemical factories.

The foregoing recitation suggests some deviousness on the part of Mr. Riley, even though the removal activities turned out to have no consequences as far as this case is concerned. This evidence does not, however, in my opinion, warrant a conclusion that there was a general conspiracy encompassing the failure to reveal the existence of documents, which I view as a discrete problem. The only common thread is the secretive disposition of Mr. Riley.

Plaintiffs also argued that there was a conspiracy between Beatrice and its expert hydrogeologists to subvert the results of the 1985 pump test of wells G and H by failing to monitor Riley well # 2. The weight of the evidence was that it was the suggestion of these experts to monitor well # 2 in the first place, but they were unable to do so because of the shape of the wellhead. Accordingly they devised a substitute test. Failure of various witnesses to recall conversations and correspondence six or seven years in the past is very slim evidence of fraud. Without detailing every item of testimony adduced by the plaintiffs, in my opinion the aggregate evidence was insufficient to establish the generalized conspiracy which they so earnestly asseverate.

Aside from Messrs. Facher and Jacobs, whose roles have been described above and in my memorandum and order of January 22, 1988, the key players in the concealment of the Yankee and GEI reports and various less significant documents were Mr. Riley and his attorney Ms. Ryan. Before assessing their roles in the matter it is necessary to make a preliminary determination of whether their conduct is chargeable to the defendant.

It is clear that Ms. Ryan and defendant's lawyers were in close communication with one another during the discovery period and in preparation for the trial in this case. A large part of the fees charged by Ms. Ryan's law firm for her representation of the Riley interests were paid by Beatrice. Riley expressed a personal interest in es-

2. This was established through the testimony of Dr. Owen C. Braids, a soil chemist. I initially viewed Dr. Braids with considerable distrust because of some highly suspect testimony concerning methanotropic bacteria which he gave during the original trial. His analysis of this reddish-brown material convinced me that on this subject, at least, he is a genuine expert. He was subjected to an extremely well-prepared and aggressive cross-examination by plaintiffs' counsel, but the harder he was pressed the more convincing he became. The plaintiffs' expert, on the other hand, was a medical toxicologist who is only minimally qualified as a chemist, and his analytical method was relatively crude. Accordingly, I reject his opinion that the tested material contained animal fat.

tablishing that the Tannery was "clean," so that his interest coincided with the defendant's. As described above, defendant's attorneys shifted the responsibility for dealing with the plaintiffs' attempts to obtain discovery of Riley documents to Ms. Ryan. The words used by the court of appeals, "agency" and "privity," carry historical baggage which would serve no useful purpose to explore. In my view, the activities of Ms. Ryan, Mr. Riley and the defendant's attorneys were so functionally synergistic, however otherwise categorized, that the conduct of Ms. Ryan and Mr. Riley should be attributed to the defendant.

■ Mr. Riley ordered the Yankee report in 1983, without the knowledge of his attorney, partly because he was concerned about possible litigation, but mostly because Margaret Hanley, Yankee's project manager, persuaded him it would be a good idea. The GEI report was ordered by Mr. Riley with the assistance of his lawyers, Nutter, McClennen & Fish (Ms. Ryan's firm) because certification of compliance with certain environmental regulation was a necessary prerequisite to the obtaining of financing. GEI recommended further studies to be done by it, but Mr. Riley and the attorneys determined that the expense of further study was not warranted and this recommendation was eliminated from the report. Mr. Riley testified that he never told Beatrice about these reports because he considered that what he did after the resale to him was none of Beatrice's business. He did give both reports to Ms. Ryan.

In his testimony on deposition and at trial Riley denied the existence of these reports. With respect to each question, taken separately, the answer might be justified because of hypertechnical interpretations of the questions posed by the interrogator. (For instance, "Did *you* test the sludge?" Answer! "No." Fact: He *caused* a test to be made by someone else.) Similarly one could quibble over the definition of the documents. There were enough such questions, however, so that any fair response should at one time or another have revealed the existence of these reports. In addition, Mr. Riley denied the existence of laboratory reports and chemical formulas which were clearly called for. Even allowing for Mr. Riley's apparent unsophistication and inarticulateness, I conclude that the pattern of evasive answers concerning these reports and the other documents by Mr. Riley requires a finding that the concealment was deliberate.

■ Ms. Ryan took (and takes) the position that the Yankee and GEI reports are protected from discovery under Fed.R. Civ.P. 26(b)(3). In view of the history of these reports this position is subject to considerable question as a matter of law, particularly with regard to the GEI report, but I suppose it is at least arguable. Invocation of Rule 26(b)(3), however, does not permit concealment of the exempted documents, which must be identified sufficiently to permit judicial resolution of the issue if it is contested by the party seeking discovery.

In 1986, the plaintiff deposed Edward Foley, who was represented to be the keeper of the records of the tannery corporation (Mr. Riley having sold the business to his former employees). The deposition subpoena called for

[all documents including] site inspection reports, geophysical studies or reports, plans, photographs, diagrams, ... relating or referring to ... [the John J. Riley Co.]

Ms. Ryan filed a general objection to the production of such documents (except as to the 15 acres) on the ground of relevance and the privilege accorded "attorney work product." No such documents were produced at the deposition.

Foley was then asked if there were any documents responsive to the quoted language of the subpoena which he had not brought with him. He answered "No." It is probable that Foley, who was an office manager, did not know about the reports. Ms. Ryan, however, who was present, did know about them and did not correct the answer. Although the plaintiffs did not file a motion to compel, the matter was resolved outside of court by Ms. Ryan's production of documents that had been

identified at the deposition as withheld, but not the Yankee and GEI reports. Plaintiffs, accordingly, did not press a motion to compel. By this lack of candor and subsequent misdirection the plaintiffs were led to believe that no other reports existed.

In my opinion, the behavior of Mr. Riley and Ms. Ryan described above constitutes "deliberate misconduct" entitling the plaintiffs, under the new rule of the court of appeals, to a presumption that the nondisclosure of the reports substantially impaired their preparation for trial.

It is so ordered. The clerk will assign a date forthwith for a conference to settle upon the "orderly procedure" mandated by the court of appeals for the next stage of these proceedings.

APPENDIX

United States District Court

District of Massachusetts

Anne Anderson, et al., Plaintiffs,

v.

Beatrice Foods Co., Defendant

Civil Action No. 82–1672–S

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR A NEW TRIAL

January 22, 1988

This motion under Fed.R.Civ.P. 60(b)(2) and (3) for a new trial arises out of the plaintiffs' discovery in September, 1987 of a report prepared in 1983 by Yankee Environmental Engineering and Research Services, Inc. ("YE$^2$ARS") for John J. Riley Tanning Company, Inc. ("the Riley Company"). This report was submitted to the Environmental Protection Agency ("EPA") by the successor to the Riley Company in December, 1986, several months after the close of the trial in this case, in connection with an ongoing study of the Aberjona Valley aquifer by the EPA. The plaintiffs assert that this report constitutes new evidence under Rule 60(b)(2) or alternatively was improperly withheld during discovery by the defendant under circumstances that constitute fraud or misrepresentation under Rule 60(b)(3).

The first question concerns the timeliness of the motion. On September 17, 1986, I wrote a rather extensive memorandum denying the plaintiffs' request for reopening of the trial after an adverse verdict and ordering the immediate entry of judgment. A separate form of judgment was prepared and signed by the deputy clerk on October 2, 1986. A copy is with the papers and a copy was sent to defendant's counsel. No entry is made on the docket. It does not appear whether a copy was sent to plaintiffs' counsel. They deny having seen it. Plaintiffs did, however, file a notice of appeal on October 31, 1986 and proceeded to prepare an appeal to the Court of Appeals. In late April or May, 1987, counsel's attention was called to the lack of a docket entry of judgment. Counsel called the deputy clerk, and the deputy clerk submitted a form of judgment for my signature. Judgment for the defendant was entered on May 8, 1987. No notice of this entry was given to the defendant by the clerk.

I have not been able to get any explanation from the deputy clerk of the several lapses in the procedures of his office.

In any case, a motion for a new trial under Rule 60(b)(2) and (3) must be made within one year from the entry of judgment. In my view, the judgment was not entered until a docket entry was made on May 8, 1987, although it is clear that it ought to have been entered on October 2, 1986 and that the parties conducted themselves as if it had been. Accordingly, this motion was timely filed.

I. *Analysis of the 1983 Report.*

YE$^2$ARS dug test pits and five test wells on the tannery property in 1983. The tannery property is upland lying to the west of the Aberjona River floodplain and is the location of the Riley Tannery. It is to be distinguished from the 15–acre parcel lying in the floodplain of the Aberjona, on which was found high concentrations of chlorinated solvents and which was the focus of the case against the defendant Beatrice Foods

Co. The tannery property and the 15–acre site had both been owned by the original tannery corporation, and subsequently owned by Beatrice until 1983, when the tannery property was resold to the Riley Company, and the 15 acres were sold to the Wildwood Conservation Corporation. Both corporations were owned by John J. Riley, who had been the owner of the original tannery corporation and the manager of the tannery while it was owned by Beatrice.

The report stated in summary that the tannery property was located on loose and highly permeable subsoil in which the ground water flow was consistently from west to east, i.e., toward the 15 acres and the river valley. Two production wells (PW1 and PW2) used by the tannery had been found in 1980 and 1981 to contain significant amounts of the chlorinated solvents at issue in this case. PW1 is on the tannery property; PW2 is on the 15 acres. In 1983, .4 part per *billion* each of trans 1,2–dichloroethane and trichloroethane was found in PW1 and .7 part per *billion* of trans 1,2–dichloroethane was found in one of the test wells. Various metals and other chemicals not relevant to this case were found on various parts of the property. Sludge taken from a sedimentation tank of factory wastes had been mixed with fill on the northwest part of the property, and the result was a black sludge resembling peat. Its permeability was "expected to be similar to naturally occuring [sic] peat and organic matter ($10^{-2}$ to $10^{-3} ft^3/ft^2 day$) (ft/day)." This was not the tested permeability of the peat in question but appears to be a standard rating for peat in general and indicates low permeability.

In addition, the report contains the conclusions that groundwater flow at PW1 is influenced by pumping at PW2 and that contaminants at PW1 *may* contribute to the contamination of PW2. The studies do *not* indicate, however, that groundwater up gradient of PW1 (i.e., at the tannery site) is influenced toward PW2. In general, the possibility of contamination of groundwater at PW2 (on the 15–acre site) by chlorinated solvents on the tannery site, while not definitely excluded, is substantially discounted.

## II. *New Trial Because of Newly Discovered Evidence (Rule 60(b)(2))*

In terms of the effect of newly discovered evidence, it probably can be safely assumed that if the 1983 YE $^2$ARS report had been introduced at trial, there would also have been introduced a 1985 follow-up report by Geotechnical Engineers, Inc. ("GEI"), which was based on the data developed in the 1983 study. The 1985 report recites that there were no relevant chemicals detected in the landfilled sludge north of the catchbasin. The detection limits of this test for trichloroethane and tetrachloroethylene were 5 parts per billion, for trichloroethylene 10 parts per billion and for dichloroethylene 50 parts per billion. It leaves open the *possibility* of contamination in lesser quantities. The report concludes that the tannery site is not the source of contamination to the east or of City of Woburn Wells G and H.

Furthermore, introduction of the 1983 YE $^2$ARS report would have inevitably led to the testimony of Ms. Margaret Hanley, a geologist who was the project manager for both reports, having herself migrated from YE $^2$ARS to GEI. Among other things, she would have testified according to her affidavit that reported concentration of less than one part per billion in groundwater "may be unreliable since it is possible for such levels to be obtained as a result of laboratory or equipment error or instrument contamination."

In considering the probable impact of the 1983 YE $^2$ARS report, however, I have disregarded the 1985 report and Ms. Hanley's affidavit, and evaluated it as an isolated item. I find the 1983 report more favorable to the defendant than otherwise, or at the most of neutral value, and I conclude that even if it had been introduced at trial, it would not have been likely to affect the result. The plaintiffs' arguments to the contrary are undeniably creative but in my view unpersuasive.

Plaintiffs' first argument is that the reference to the low permeability of peat

would have supported Dr. Pinder's testimony that the bottom of the Aberjona River was sealed by a layer of relatively impermeable peat so that water would not have been drawn in substantial amounts from the river into Wells G and H when they were pumping. Indeed, it was a major issue at trial whether the bottom of the river was a "seal" as contended by plaintiffs, or a "sieve" as contended by the defendants. That issue did not turn on the permeability of peat, defined by Dr. Pinder as a dense amalgam of fine organic particles, however, but whether the river was lined with that kind of peat or with a loose jumble of roots, branches and uncompacted organic detritus. I do not find that the 1983 report would have had any effect on this dispute, or in any way assisted Dr. Pinder in explaining the substantial loss of water from the river during the pumping test as measured from the site upstream and downstream of the wells.

Secondly, the reference in the report to the sludge and fill having a peatlike appearance is said by plaintiffs to support their assertion that certain material found by them on the 15–acre site and also described as having the appearance of peat came from the tannery. The material found on the 15–acre site was in one instance rust-colored and in another instance bright orange coated with black. Both were impregnated with various chemicals, including chlorinated solvents and chemicals associated with tanning leather. They had a leatherlike smell. Samples of these items were introduced at trial, but never linked to the tannery operation. The peat resulting from the sludge and fill is described as black. The jury and I observed the sludge from the sedimentation tank. It is uniformly dark grey and emphatically does not have a leatherlike smell. It smells of the barnyard, and right pungently too. All the report does is describe the sludge and fill as peatlike, the same phrase used by plaintiffs' witness to describe the material found on the 15 acres. That is not enough to connect two obviously disparate substances. Furthermore, it is my recollection that the sludge and fill combination was described in the same general terms by either Riley or Foley in the course of the trial.

Thirdly, the report is supposed to have supported the plaintiffs' position that the west bank of the Aberjona valley was made of highly permeable subsoil. So far as I remember, this proposition was never contested, and indeed is implicit in the general reference to the valley as an aquifer.

Fourthly, by showing that groundwater at PW1 was influenced by pumping at PW2, the report shows that the railroad bed along the west side of the river is not a barrier to the cone of influence of Wells G and H. Again, I don't believe this was an issue at the trial. One of the plans available to the plaintiffs showed the cone of influence extending to the west of the railroad, though not at this point. Further, it was known that in the area of PWs 1 and 2 there was a natural swale running from the tannery property to the river containing a brook which ran under the railbed through a culvert. If the plaintiffs had been concerned with this phenomenon, it was clear enough. The contamination of both Riley production wells was covered in the testimony, and the subject of a long (and irrelevant) cross-examination of Mr. Riley by plaintiffs' counsel concerning drinking water in the tannery plant. Moreover, all the significant contamination was to the east of the railroad anyway.

Fifthly, plaintiffs claim that the 1983 report would bolster Dr. Pinder's assertion that PW2 had a weak influence on the ground water flow in the valley and thus would have not greatly encroached on the cone of influence of Wells G and H. The report says that pumping of PW2 did not significantly affect ground water flow at the tannery site, considerably uphill. It says nothing about its influence in the floodplain of the Aberjona.

Lastly, plaintiffs' counsel asserts that the report shows the tannery property to be the source of the same chlorinated solvents which contaminated Wells G and H. This is rhetorical excess. The report does not show that. The .7 part per billion of trans 1,2–dichloroethane is not significant, even assuming that it is the same sub-

stance as 1,2–transdichloroethylene which is alleged to have contaminated the well. It was the uncontradicted testimony of Dr. Braids that they were not the same compounds and in fact were in a different chemical chain.

The parties agree that for a new trial to be granted because of newly discovered evidence, the evidence must be significant enough to create a probability that it would have altered the result if introduced at trial. As I have stated, I am not persuaded that it probably would have altered the result. In fact, it is my opinion that it would have had no effect on the result. Accordingly, insofar as the motion relies on Rule 60(b)(2), it is DENIED.

### III. *New Trial by Reason of Fraud or Misrepresentation, Rule 60(b)(3).*

Resolution of the Rule 60(b)(3) issues requires a more detailed, more difficult and more speculative analysis. Plaintiffs claim that the 1983 and 1985 reports were deliberately withheld by the use of false statements in discovery responses, or alternatively, that defendant's counsel was guilty of "gross neglect" in failing to disclose the reports.

For the plaintiffs to prevail, they must establish the deliberate misconduct of the defendant or its counsel by clear and convincing evidence, and with respect to withholding of information, that they were prevented from fully and fairly trying their case, regardless whether the result would have been different. *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir.1978); *Petry v. General Motors Co.,* 62 F.R.D. 357 (E.D. Pa.1974). Among the considerations are the defendant's duty to provide the information, the sufficiency of plaintiffs' requests and the diligence of its pursuit of discovery, the degree to which the evidence supports a conclusion of misconduct, and the extent to which it is likely that plaintiffs would have altered their trial strategy if the information had been provided.

The defendant says that this was not information within its control, but that the 1983 report was prepared for the John J.

Riley Tanning Company, Inc. (the "Riley Company"), a separate and unrelated corporation and the 1985 report was prepared for its law firm, Nutter, McClennen & Fish. The defendant's counsel says that it was his understanding with plaintiffs' counsel that plaintiffs would look to the Riley Company and its counsel for information in their possession and control. This arrangement is borne out to some extent by the record, which shows that plaintiffs took the depositions of John J. Riley and other personnel of the Riley Company, who were represented by Attorney Mary Ryan of the firm of Nutter, McClennen & Fish. Ms. Ryan also represented the Wildwood Conservation Corporation, the new owner of the 15 acres, and plaintiffs negotiated with her for their extensive drilling and digging on this site.

At this point, it becomes necessary to summarize the course of the pretrial proceedings. The case started off with considerable fanfare and an acrimonious Rule 11 proceeding. Discovery proceeded with reference to medical matters for several years. Both sides wished to extend the discovery period to await the completion of massive studies of the Aberjona valley by the Environmental Protection Agency and the United States Corps of Engineers. In the late spring of 1985, site investigation began in earnest, beginning with the W. R. Grace Co. facility on the east side of the valley. In the fall, the plaintiffs turned their attention to the 15–acre site. A heavy schedule of depositions began (8–14 depositions a day). The plaintiffs insisted that they would be ready for trial in February, 1986 and adamantly opposed any extension in the face of the defendant's pleas that they could not prepare for the new information and the new discovery called for by the plaintiffs and still prepare for trial. I also cautioned plaintiffs' counsel that the frenzy of discovery indicated that the plaintiffs' own case was still being prepared and that it would be a mistake to rush to trial without adequate preparation.

The first request to me for an order to go on the tannery site was on January 15, 1986, one month before trial. I denied it because it was too late in my opinion to

open up a new area of investigation which the defendant would not have a chance to evaluate before trial. I therefore denied the request and also cut down on other last minute discovery. The plaintiffs would not agree to an extension of the trial date.

Prior to this hearing, plaintiffs had noticed the deposition of Edward J. Foley, treasurer of Riley Leather Company, which had purchased the tannery site from the Riley Company. Ms. Ryan had objected to so much of the deposition subpoena as would have required the production of the 1983 and 1985 reports. At the January 14, 1986 hearing, Ms. Ryan called to my attention the fact that she had raised these objections and that she expected the plaintiffs to file a motion to compel production of the withheld documents. Plaintiffs' counsel replied that the question had been resolved. Since he did not put Ms. Ryan's objection to the test, he cannot now seek a new trial on the basis that the reports were not furnished at the deposition of Foley. Plaintiffs' counsel also asserts that a similar subpoena duces tecum was issued for John J. Riley. Ms. Ryan says that the attachment cataloguing documents was not attached to the subpoena. In any case, the issue was not raised at trial during the extensive cross-examination of Riley, and cannot be raised now.

I must then review the record to see if Beatrice or its counsel (as distinguished from Ms. Ryan and her clients) had a duty to produce these reports at any point in the proceedings. I reject as unsubstantiated the accusation of plaintiffs' counsel that Ms. Ryan and Beatrice counsel were engaged in a deliberate conspiracy to deprive the plaintiffs of information. The fact that their interests coincided from time to time does not support an assertion of conspiracy.

I also reject defense counsel's denial of any control over documents in the possession of the Riley Company, its counsel, the successor corporation, Riley Leather Company, and the Wildwood Conservation Corporation. When Beatrice sold the tannery and the 15 acres back to the Riley interests, after the commencement of this litiga-

tion, it agreed to be responsible for any liability imposed in this litigation on account of activity on these properties occurring prior to the closing date of the sale, January 6, 1983. In connection therewith, the Riley Company and Wildwood agreed to make available to Beatrice all records and personnel reasonably requested by Beatrice for the conduct of its defense. In my view, although the Riley corporations were not parties, the contract causes their records to be "available" to the defendant and "under the control" of the defendant within the meaning of Fed.R.Civ.P. 33 and 34. Accordingly, the defendant was required to make reasonable inquiry of the Riley interests through Ms. Ryan concerning the existence of any documents fairly called for by interrogatories and requests for production. Defendant's counsel did not read the contract as imposing this requirement and did not make such inquiry of Ms. Ryan or her clients. Whether this default was sufficiently egregious as to require a new trial requires a detailed review of the discovery history. For this I rely on the Plaintiffs' Submission Regarding Their Exercising Due Diligence and Defendant's Wrongful Suppression (Plaintiffs' Chronology) filed November 2, 1987 and defendant's Response and Opposition to Plaintiffs' "Chronology, etc." filed November 10, 1987.

In the plaintiffs' Chronology are references to requests for extensions of time to which in general the plaintiffs assented and the filing of objections. No inference of improper concealment can be drawn from either of these filings. Requests for extensions in complex cases are commonplace and in fact the plaintiffs were often late in responding to discovery. Frivolous or unfounded objections may be the subject of sanctions but they must be tested by timely challenges. I deem any challenge to objections taken during the course of discovery to have been waived.

Similarly, the history of discourse between Nutter, McClennen & Fish and the Attorney General does not bear on this case. It dealt with waste disposal through the MDC. In it the Riley Company took the position that chlorinated hydrocarbons

in the waste water came from the admittedly polluted PW2, which in turn was polluted because of endemic conditions in the Aberjona Valley which were not specific to the tannery. There is nothing in this record to show that this was a wrongful conclusion, and quite a lot of evidence supporting it.

Similarly, defendant's assertion in pleading that the tannery was not the source of pollution of the aquifer is a misrepresentation only if the plaintiffs' allegations are correct and the defendant knew them to be correct. Neither proposition has been proven, and indeed neither proposition has credible support in the record up to this point.

The proper focus of the inquiry is on the specific requests for information and the specific responses of the defendant. The first of these were presented in plaintiffs' first set of interrogatories. Interrogatory 30 called for reports such as the YE²ARS report. The response was filed in April of 1983, before the YE²ARS report was in existence. No supplemental answer was ever filed. Interrogatories 40, 41 and 42 refer specifically to documents in the possession of any officer or employee of Beatrice Foods Co. By reason of that limitation, these interrogatories did not trigger the obligation to make reasonable inquiry of the Riley Company or its lawyer. On May 30, 1985, in response to a court order, defendant answered that it had no such documents. This was a true answer, given the limitation in these interrogatories.

In the second set of interrogatories, plaintiffs ask for documents dealing with disposal of wastes or any related activities at the Riley tannery in the possession of any officer or employee of the Riley Company (# 92). On April 2, 1983, the defendant answered that none such existed. This was a true answer when filed, but was never supplemented.

On December 3, 1984, plaintiffs filed a request for the production of documents relating or referring to defendant's storage or disposal of chemicals at the property at issue on the John J. Riley Company. In

effect, the defendant objected to producing material dealing with the tannery and stated there were no such documents relating to the "Riley land," presumably referring to the 15 acres.

On April 3, 1985, John J. Riley, Jr. was deposed as follows:

Q. Have you ever done an analysis of that soupy sedimentation material?
[Objection]
Q. My question to you is: Have you ever done an analysis or testing of that sedimentation tank material?
[Colloquy]
A. No.

In fact, YE²ARS had done a test of the sludge after it had been removed from the tank and mixed with fill. If Riley understood the question to mean a test of the material in the tank, his answer was correct. It is not clear what was meant. In any case, in fairness to Riley, it should be noted that the 1983 report made only a passing reference to the testing of solid fill. The testing results are in an appendix in a form not readily accessible to a layman. The 1985 GEI report does describe the testing of the solid fill in detail, but, according to Miss Hanley's affidavit, this report was not submitted to Riley at all, but went directly to Nutter, McClennen & Fish, the attorneys for the Riley Company. I am not prepared to find clear and convincing evidence of fraud from this recitation.

On May 30, 1985, the defendant filed a further answer to No. 80 of the second set of interrogatories. No. 80 asked for chemical concentrations that indicated contamination of the Riley production well (presumably PW2). If the defendant had made inquiry of the Riley Company, it should have included the 1983 YE²ARS report in its response.

In their third set of interrogatories, plaintiffs in interrogatory # 2 ask for a description of all inspections of the "Riley land" by Beatrice Foods, its servants, agents or employees and by the Riley tannery, its servants, agents or employees since May, 1979. In its answer, defendant assumes that "Riley land" means the 15 acres and makes no answer with reference

to the tannery site. This assumption does not appear to have been challenged by the plaintiffs.

On December 20, 1985, plaintiff filed a second request for production of documents seeking, among other things, all site inspection reports.

On or about January 10, 1986, counsel for defendants learned of the existence of the 1983 and 1985 reports. On January 17, 1986, the defendant responded to the request for production that it would produce responsive documents in its possession. It did not provide the 1983 and 1985 reports. Counsel for the defendant stated in argument that in his opinion these reports were not site inspection reports, and that he therefore was not obliged to produce them.

The duty on the defendant to make inquiry of Ms. Ryan and her clients is ordinarily discharged with respect to a specific discovery request by one inquiry. Defendant was not required to call her every day to ask what was new. In my view, however, a new discovery request in different terms demands a new inquiry. If my analysis is correct, the defendant defaulted in its obligations after the completion of the 1983 report in its failure to fully answer to Interrogatory 80 on May 30, 1985. Moreover, Rule 26(e)(2)(B) requires that a party supplement a response when it learns that the response is no longer true. In January, 1986, defense counsel learned of these reports and should have supplemented its answers and, in my view, should have revealed the reports in response to the second request for the production of documents.

I do not draw the inference from these defaults, however, that the defendant deliberately and fraudulently suppressed these

reports. These reports are not significantly detrimental to the defendants, and in fact contain many conclusions that are favorable to them. Given the vast amount of information made available to the plaintiffs in the course of the trial, it seems inconceivable that experienced and competent counsel would have swallowed the camel and strained at the gnat.[1] Moreover, the Riley Company was not an agent of the defendant, and there was no prior court ruling establishing the obligation I postulate herein to make inquiry based upon a contract such as existed in this case. I base my ruling solely on an interpretation of the words "available" and "control" in Rules 33 and 34. Counsel may well have thought he was entitled to rely on the informal arrangement between Ms. Ryan and plaintiffs' counsel. Failure to disclose these reports in January, 1986 was in my view a lapse of judgment, but in the midst of the discovery frenzy that was initiated by plaintiffs in that period, these reports may have seemed minor. In any case, I do not find that fraud or deliberate misrepresentation has been established by clear and convincing evidence.[2]

That finding does not end the inquiry, however, because Rule 60(b)(3) goes further according to *Rozier* and requires a new trial if the "misconduct" of the defendant has prevented the plaintiffs from fully and fairly presenting their case. As the court noted in *Rozier*, this is a "vexing question."

Assuming for the minute that the reports need not have been furnished until January, 1986, failure to furnish them had no effect on the plaintiffs' preparation whatsoever. Plaintiffs claim that if they had known of the reports they would have monitored the five test wells on the tannery site during the pumping test of Wells G

---

1. The gospel according to St. Matthew, 23:24. Plaintiffs' assertion that these reports represented a real threat to the defendant requires the creation of an imaginative scenario for which there appears to me to be little if any support.

2. Plaintiffs point to an "altered document" furnished by the defendant in response to an interrogatory. The interrogatory called for information about water testing. In response, defendant submitted a report, part of which dealt with water testing, and from which other subjects had been redacted. It was plain from the appearance of the document that portions had been redacted. This was a perfectly appropriate response to the interrogatory; indeed, it is not good practice to lard a response with information not requested. Plaintiffs' argument that this is evidence of a fraudulent intent is unworthy, particularly from counsel who have made strident demands for fairness.

and H and would have conducted tests of the solid fill on the site. In January, 1986, however, the pumping test was all over. At that time the plaintiffs sought an order to test the tannery site in any case. I denied it because it was too close to trial to open up a new area of complaint without giving the defendant time to evaluate and respond to whatever information was developed. Plaintiffs were adamant about holding the trial date. I would not have made any other ruling if I had known of these reports. The controlling factor of the imminence of trial would not have changed, and I would not have been impressed by the scant promise of success to the plaintiffs offered by these reports.

I think it is likely, however, that if these reports had been furnished prior to the pump tests, as on one theory at least they should have been, the plaintiffs would have monitored the five test wells on the tannery property, although they did not in fact monitor PW1 and PW2. I believe it highly unlikely that the results would have been significant. At best, it would have added some slight corroboration to their cone of influence theory. The 1983 report shows that ground water at the tannery was not influenced by the pumping of PW2, a very powerful pump at the very foot of the hill on which the tannery sits. It seems to me wildly speculative that it would have been influenced by Wells G and H, which were at least 1,800 feet farther away. The test wells were on high ground, substantially above the floodplain where the other monitoring wells were located. In any case, this default cannot be cured by a new trial. It is no longer possible to have a pump test of Wells G and H; they have both been totally dismantled by the City of Woburn.

If the plaintiffs had received the reports early in the course of discovery, would they have been diverted from the productive discovery they were otherwise engaged in to test fill in which no chlorinated solvents had been found and in which the only positive test was of .7 part per billion in one test well? I think it unlikely. In January, 1986, Mr. Nesson said that the plaintiffs had been busy with the complex medical

evidence and the excavation of the W.R. Grace site. In the fall of 1985 they had gotten around to the 15 acres, where there were concentrations of many thousands of parts per billion. According to Mr. Nesson, they were just getting around to the tannery in January of 1986. I seriously doubt that the sequence of events would have been different even if the plaintiffs had received these reports when they should have.

The integrity of the discovery process is clearly central to the conduct of litigation in the federal system, and any default in responses to discovery is a serious matter deserving of the most careful attention. After consideration of what I believe to be the pertinent factors, however, I find that the plaintiffs have not satisfied their burden of showing by clear and convincing evidence that misconduct of the defendant prevented them from fully and fairly presenting their case.

Accordingly, the motion for a new trial is DENIED.