Riley v. Harr, et al.                    CV-98-712-M    03/31/00
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


John J. Riley, Jr. and
Diana W. Riley,
      Plaintiffs

      v.                                  Civil No. 98-712-M
                                          Opinion No. 2000DNH084
Jonathan Harr,
Random House, Inc., New York,[1]
Random House Audio Publishing, Inc.
and Vintage Books,
      Defendants


                         **O R D E R**


      Plaintiffs John J. Riley, Jr. ("Riley") and Diana W. Riley

brought this defamation action against Jonathan Harr, the author

of A Civil Action ("the book"), as well as Random House, Inc.,

Random House Audio Publishing, Inc., and Vintage Books,

publishers of the hardback, audio, and paperback versions of the

book, respectively.[2]  Plaintiffs' amended complaint asserts the

---

      [1]Although plaintiffs' amended complaint names "Random House,
Inc., New York" as a defendant, defendants assert in their brief
that "Random House, Inc." is the correct name for this entity.
The court will use the latter name in this opinion.

      [2]The case was originally filed in the New Hampshire Superior
Court and later removed here by defendants on the basis of
diversity jurisdiction.

following seven counts: (I) intentional infliction of emotional distress; (II) slander (against Harr only); (III) defamation; (IV) invasion of privacy - public disclosure of private facts; (V) invasion of privacy - placing the plaintiff in a false light; (VI) loss of consortium; and (VII) a claim for enhanced compensatory damages.  Defendants move to dismiss, or in the alternative, for summary judgment on, all counts.  Plaintiffs object.


## Background

A Civil Action achieved both commercial success and critical acclaim.  It spent at least 128 weeks on the New York Times Paperback Bestsellers List; has been made into a motion picture; won the National Book Critics Circle Award for Nonfiction; and, according to an article in the New York Times, the book is "required reading in courses in at least 50 law schools."  (Ex. 3 to Defs.' Br.)  The book is purportedly a nonfictional account of the events surrounding a toxic tort lawsuit brought in the United States District Court for the District of Massachusetts against W.R. Grace & Co., Beatrice Foods Co., and others, originally captioned as Anderson, et al. v. Cryovac, Inc., et al., Civ. A.

No. 82-1672-S (D. Mass.) (the "underlying suit"). Although the book recounts the progress of the litigation from various sides, drawing in part on interviews of both plaintiffs' and defendants' counsel, the central figure in the book is plainly Jan Schlichtmann, lead counsel for the plaintiffs.

Because consideration of the issues raised in this case requires some reference to the underlying suit, a brief review of that case follows, including only those matters pertinent to understanding this case. Additional facts related to the underlying suit will be discussed later, as necessary.

The underlying suit alleged that the defendant companies contaminated the public water supply in Woburn, Massachusetts, with certain chemicals (referred to as the "complaint chemicals"), including trichloroethylene ("TCE"). The underlying suit further alleged that the contamination resulted in the death of five local children, from leukemia. One of the sites from which the contamination may have originated was a fifteen acre vacant parcel of land previously owned by the John J. Riley Company ("Rileyco") from 1951 to 1978. During that time Rileyco was owned and operated by the Riley family. It operated a tannery to the southwest of the fifteen acre parcel. In 1978,

3

Beatrice Foods Company ("Beatrice") acquired Rileyco's real property and assumed its environmental liabilities. The tannery became a division of Beatrice, with John Riley serving as its chief operating officer. In 1983, Beatrice divested itself of the Rileyco property. The tannery was resold to John Riley, who again operated it under the name Rileyco. The fifteen acre parcel was sold to a separate company, Wildwood Conservation Corporation, that Riley also controlled.

The presiding judge in the underlying suit scheduled trial in three stages. In the first stage, plaintiffs would have to prove that the defendant companies were responsible for introducing the complaint chemicals into the municipal wells that supplied the plaintiffs with water ("Wells G and H"). That first phase was tried to a jury, which returned answers to special interrogatories mandating judgment in favor of Beatrice.[3] The jury found that plaintiffs failed to prove any of the complaint chemicals had been "'disposed of at the Beatrice site . . . and substantially contributed to the contamination of Wells G and H'" during the relevant time periods. Anderson v. Cryovac, Inc., 862

---

[3]The jury also found that W.R. Grace & Co. had contaminated the wells with TCE and tetrachloroethylene. That verdict was later vacated, however, and a new trial ordered as to W.R. Grace. See Anderson, 862 F.2d 910, 915 n.2 (1st Cir. 1988).

4

F.2d 910, 914 (1st Cir. 1988). Plaintiffs in the underlying suit appealed.

While the appeal was pending, plaintiffs discovered that a hydrogeologic investigation of the tannery property had been conducted in 1983 by Yankee Environmental Engineering and Research Services, Inc. ("Yankee"), at John Riley's behest. Plaintiffs also discovered that a "follow-up" study using Yankee's data had been conducted by Geotechnical Engineers, Inc. ("GEI") in 1985. Anderson v. Beatrice Foods Co., 127 F.R.D. 1, 7 (D. Mass. 1989)(appended copy of the court's January 22, 1988 order). Neither the report of Yankee's findings, nor the supplemental GEI report (collectively, the "Report") had been produced to plaintiffs during discovery.

Plaintiffs moved for a new trial under Fed. R. Civ. P. 60(b)(2)(newly discovered evidence) and 60(b)(3)(fraud or misrepresentation by adverse party). Plaintiffs' motion was eventually denied, on grounds that Beatrice's failure to produce the Report did not substantially impair plaintiffs' ability to prepare their case. The trial court reasoned that "[w]hile the Report might well have been very helpful to the plaintiffs in establishing the transport of chemicals from the tannery to wells

5

G and H, in the absence of any evidence of disposal of the complaint chemicals at the site, it is no help at all." (Ex. A to Plfs.' Br. (<u>Anderson v. Beatrice Foods Co.</u>, Civ. A. No. 82-1672 -S, slip op. at 15 (D. Mass. Dec. 12, 1989).)

<u>Standard of Review</u>

In this case, defendants move to dismiss Count I and Counts III through VII under Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. Defendants argue that these claims are particularly suited to disposition on a motion to dismiss. <u>See</u> <u>Mitchell v. Random House, Inc.</u>, 703 F. Supp. 1250, 1258 n.10 (S.D. Miss. 1988)("[T]he nature of a libel action lends itself to judicial scrutiny in the early stages of a defamation lawsuit."), <u>aff'd</u>, 865 F.2d 664 (5th Cir. 1989). "'One substantial factor is that the communication complained of is usually before the court at the outset . . . . Thus, unlike most litigation, in a libel suit the central event - the communication about which suit has been brought - is usually before the judge at the pleading stage.'" <u>Id</u>. (quoting R. Sack, <u>Libel, Slander and Related Problems</u> 533-34 (1980)).

Defendants also assert that this court may consider the public court documents in the underlying suit without converting their motion to dismiss into a motion for summary judgment, as required by Fed. R. Civ. P. 12(b).[4] See, e.g., Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)(noting the exception to the Fed. R. Civ. P. 12(b) conversion rule for, inter alia, official public records, and holding that district court properly considered on a Rule 12(b)(6) motion documents including abuse and neglect petitions and state district court orders); Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994)(noting that a district court may take judicial notice of matters of public record, such as public court records, without converting a motion to dismiss into a motion for summary judgment). Accordingly, court documents from the underlying suit can be considered in this case without changing the nature of defendants' motion to dismiss. However, defendants have also submitted documents that

---

[4]Federal Rule of Civil Procedure 12(b) provides in part: If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

7

are outside the pleadings and do not qualify as public records, including a U.S. News & World Report article.  So, the court will treat defendants' motion as one for summary judgment.[5]

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party carries its burden, the burden shifts to the

---

[5]Given defendants' alternative styling of their motion as one for summary judgment, plaintiffs were "given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b).  Plaintiffs did in fact submit a number of materials with their objection and have actually treated plaintiffs' motion as one subject to the summary judgment standard of review.  (See Defs.' Br. at 12.)

8

nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor.  DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegations or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Defendants move to dismiss Count II under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction over Harr.  Where a defendant contests the court's jurisdiction over him, plaintiffs have the burden of proving that such jurisdiction does exist. See, e.g., Buckley v. Bourdon, 682 F. Supp. 95, 98 (D.N.H. 1988).

9

"Plaintiffs must make a prima facie showing of jurisdiction, supported by specific facts alleged in pleadings, affidavits, and exhibits." Id. Plaintiffs' allegations of jurisdictional facts are to be construed in their favor. Id.

Finally, the court notes that the parties disagree on which state's law governs this action. Plaintiffs claim New Hampshire law controls and defendants argue that New York law controls. Although both parties have offered to brief the issue if necessary, defendants assert that "the Court need not decide this issue at this juncture since New York and New Hampshire law are functionally equivalent with respect to the matters set forth in this motion, most of which are governed by the First Amendment." (Defs.' Br. at 16 n.2.) Accordingly, accepting defendants' representation that New York law does not materially differ, the court will assume for purposes of ruling on this motion that New Hampshire law applies.

## Discussion

Riley alleges that the following specific statements published in A Civil Action defamed him, portrayed him in a false light, and caused him emotional distress. He also alleges that

10

the statements, particularly statement L, publicly disclosed

private facts about him.

A. "The judge found that Riley had committed perjury and that Mary Ryan was guilty of 'deliberate misconduct' in failing to give Schlichtmann the Yankee report." A Civil Action, at 483.

B. "He had once confronted a neighbor who had written an article about the tannery stench for the Civic Association Newsletter. Banging on the neighbor's door one evening, he had stomped uninvited into the living room, put his thick finger to his neighbor's chest and yelled that he, Riley, was a big taxpayer in the city, and by what right did the neighbor slander his business in such a manner? The neighbor, at first taken aback by the verbal tirade, finally told Riley to get out of his house." A Civil Action, at 91-92.

C. "Riley had sworn at his deposition that he had never dumped anything on the fifteen acres. Riley had lied then, and Schlichtmann - who didn't need much convincing - believed that Riley was also lying about using TCE." A Civil Action, at 187.

D. "'They're dumping stuff in the middle of the night,' Ruth recalled his saying." A Civil Action, at 188.

E. "It seemed that everyone but Riley recognized the fifteen acres as a toxic waste dump. Riley *must* have known about the condition of the property. Perhaps, thought Schlichtmann, the tanner really had been running an unauthorized waste dump. Perhaps he had charged his neighbor, Whitney Barrel, a fee for the use of the land." A Civil Action, at 191-92.

F. "If this material was indeed tannery waste, then how had it become contaminated with TCE, which

Riley claimed he had never used?  It was, of course, possible that someone else - Whitney, perhaps - had dumped TCE on top of it.  That was possible, but to Schlichtmann the most logical explanation was that it had all come from the same place.  And if that was true, it meant that Riley had lied about TCE."  A Civil Action, at 193.

G.   "'My God, this is the guy who killed your kids!' yelled Neville."  A Civil Action, at 311.

H.   "'He's a liar but he's not stupid,' said Schlichtmann."  A Civil Action, at 312.

I.   "Because he was covering up!"  A Civil Action, at 315.

J.   "When Riley had sat on the witness stand, he'd wanted to turn to the jurors and say; 'See?  This man is lying now.'"  A Civil Action, at 371.

K.   "'We've opened the box and the worms are starting to crawl out.  This isn't just hiding evidence, this is destroying evidence.'"  A Civil Action, at 470.

L.   "He was in his mid-sixties, suffering from episodes of depression."  A Civil Action, at 480.

Defendants argue that a number of the statements in suit are constitutionally protected by the First Amendment as statements of opinion.  Although the Supreme Court in Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990), declined to recognize "an additional separate constitutional privilege for 'opinion'" as opposed to statements of fact, it did reaffirm a number of

12

earlier decisions effectively providing opinion statements with considerable protection. First, the Court affirmed that under Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767 (1986), "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least . . . where a media defendant is involved." Milkovich, 497 U.S. at 19-20. The Court then observed that "the Bresler - Letter Carriers - Falwell line of cases[6] provides protection for statements that cannot reasonably be interpreted as stating actual facts about an individual," such as statements of "imaginative expression" or "rhetorical hyperbole." Id. at 20 (internal quotation marks and bracketts omitted).[7]

Thus, many statements formerly characterized as nonactionable opinion are still protected under Milkovich,

---

[6]The cases referred to are: Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6 (1970); Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin, 418 U.S. 264 (1974); and Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988).

[7]The Court also noted the additional protection provided under New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and its progeny, namely, that even if an ostensible opinion on a matter of public concern could be held to reasonably imply defamatory falsehoods about a plaintiff, that plaintiff would still have to prove actual malice if he were a public figure or official, or some level of fault if he were a private figure. See id.

notwithstanding the Court's rejection of the notion that its prior case law had "create[d] a wholesale defamation exemption for anything that might be labeled 'opinion.'" Id. at 18. In fact, the Court of Appeals for this circuit has noted that "while eschewing the fact/opinion terminology, Milkovich did not depart from the multi-factored analysis that had been employed for some time by lower courts seeking to distinguish between actionable fact and nonactionable opinion." Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 727 (1st Cir. 1992). So, where reference is made to a protected or nonactionable opinion in this order, it means a statement of opinion that is protected under the First Amendment doctrines reaffirmed in Milkovich.

"The determination whether a printed statement is protected opinion or an unprotected factual assertion is a matter of law for the court." Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1016 (1st Cir. 1988). In making this determination, a court must examine the context in which the allegedly defamatory statement was made. See Phantom Touring, 953 F.2d at 727; McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987)(adopting "an approach that analyzes the alleged defamation in the context of the article in which it appears along with the larger social context

14

to which it relates"). A statement that, taken alone, might appear to be a factual assertion will nevertheless be nonactionable if "'the general tenor of the article negate[s] this impression.'" Phantom Touring, 953 F.2d at 727 (quoting Milkovich, 497 U.S. at 21).

Defendants initially point out that in overall context, A Civil Action is a description of a lawsuit, "the very definition of an adversarial contest." (Defs.' Br. at 21.) Courts examining allegedly defamatory accounts of legal proceedings have recognized that the general public "understand[s] . . . that participants in a trial often make sharply conflicting contentions, and that witnesses often give conflicting testimony." Ricci v. Venture Magazine, Inc., 574 F. Supp. 1563, 1568 (D. Mass. 1983). It is also recognized that statements by an attorney relating to his representation of a client are not those of a "disinterested observer." Brian v. Richardson, 660 N.E.2d 1126, 1131 (N.Y. 1995). Thus, a book whose purpose is "to offer the personal viewpoint of [an attorney[8]] concerning [two]

---

[8]In Partington v. Bugliosi, 56 F.3d 1147 (9th Cir. 1995), the attorney was also the author of the book. Although that fact may have had some influence in the court's analysis, see id. at 1153 (noting that "lawyers who write popular books, and particularly trial lawyers, are not known for their modesty"), this court does not find the distinction material for purposes of this case.

15

trials" with which he was involved "is a forum in which a reader would be likely to recognize that the critiques of the judges, witnesses, and other participants in the two trials . . . generally represent the highly subjective opinions of the [lawyer] rather than assertions of verifiable, objective facts." Partington v. Bugliosi, 56 F.3d 1147, 1153, 1154 (9th Cir. 1995). With these observations in mind, the court shall consider those statements defendants describe as nonactionable opinion.

Statements C, E and F

Statements C, E, and F (above) plainly represent the subjective opinions and speculations of Attorney Schlichtmann, and could not be construed by a reasonable reader as assertions of fact. Each statement is clearly written in Schlichtmann's "voice," in the form of the attorney's inner musings about the evidence he was gathering, or seeking but not finding, and the case he was presenting. Harr employs a number of unmistakable linguistic clues - words like "thought," "believed, "seemed," and "perhaps" - to inform the reader that the statements are not only Schlichtmann's personal thoughts, but even then, constitute mere speculation, often based on meager foundation:[9]

---

[9]Additional language not identified by plaintiffs as defamatory is quoted from the book to put the statements in suit

16

C.   **"At the state public health department,
     [Schlichtmann] . . . found a report - <u>he called it
     'the killer document'</u> - that proved Riley had not
     told the truth at his deposition. . . . [The
     report documented an examination of Riley's
     property by a sanitary engineer, who got Riley to
     agree to remove tannery waste found between the
     access road to the fifteen acres and the Aberjona
     River.]
         This document was thirty years old and it
     dealt only with tannery waste, which might or
     might not have contained TCE.  But even so,
     <u>Schlichtmann thought</u> it had great value.**  Riley
     had sworn at his deposition that he had never
     dumped anything on the fifteen acres.  Riley had
     lied then, and <u>Schlichtmann - who didn't need much
     convincing - believed</u> that Riley was also lying
     about using TCE."  <u>A Civil Action</u>, at 186-87
     (emphasis added).

E.   "It <u>seemed</u> that everyone but Riley recognized the
     fifteen acres as a toxic waste dump.  Riley <u>*must*</u>
     have known about the condition of the property.
     <u>Perhaps</u>, <u>thought Schlichtmann</u>, the tanner <u>really</u>
     <u>had</u> <u>been</u> running an unauthorized waste dump.
     <u>Perhaps</u> he had charged his neighbor, Whitney
     Barrel, a fee for the use of the land."  <u>A Civil
     Action</u>, at 191-92 (emphasis added).

F.   "If this material was indeed tannery waste, then
     how had it become contaminated with TCE, which
     Riley claimed he had never used<u>?</u>  It <u>was</u>, <u>of
     course</u>, <u>possible</u> that someone else - Whitney,
     <u>perhaps</u> - had dumped TCE on top of it.  That was
     <u>possible</u>, but <u>to Schlichtmann</u> the most logical
     explanation was that it had all come from the same
     place.  And <u>if</u> that was true, it meant that Riley
     had lied about TCE."  <u>A Civil Action</u>, at 193
     (emphasis added).

---

in context.  Throughout this opinion, such alteration of the
allegedly defamatory statements is indicated by placing the
additional language in bold type.  Underlining is for emphasis.

17

Such conditional language plainly identifies the cited statements as opinion, even evolving opinion, or speculation, or contemplation, and just as plainly negates any suggestion that they are to be taken as assertions of fact. See, e.g., Lyons v. Globe Newspaper Co., 612 N.E.2d 1158, 1162 (Mass. 1993)(finding that use of the word "suspicion," in statement that persons "voiced suspicion" relating to plaintiffs, "plainly cautioned the reader that the article referred to a theory rather than to facts"); Chapin v. Greve, 787 F. Supp. 557, 567 (E.D. Va. 1992)(noting that "[l]anguage of ambiguity and imprecision permeates the article, significantly coloring its tone"), aff'd sub nom., Chapin v. Knight-Ridder, Inc., 993 F.2d 1087 (4th Cir. 1993); cf. Partington, 56 F.3d at 1157 (author's use of question mark after allegedly defamatory statement "makes clear his lack of definitive knowledge about the issue and invites the reader to consider the possibility of other [explanations than the one suggested])."

Moreover, the context in which the statements are presented reveals what little information Schlichtmann had on which to base his speculations. "[I]f a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable." Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997). A reasonable reader

18

simply would not understand the author's reporting of Schlichtmann's unsubstantiated hunches and evolving theories to be assertions of fact that Schlichtmann could verify. Harr makes it clear that Schlichtmann was merely "speculat[ing] on the basis of the limited facts available to him." Partington, 56 F.3d at 1156. Since Schlichtmann is portrayed, unmistakably, as "expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement[s] [are] not actionable." Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993).

Statement J

Statement J is also nonactionable. In context, the statement reveals Schlichtmann's thoughts prior to making his closing argument to the jury:

> J.      **"[Schlichtmann] yearned to speak to the jurors. At times during the trial this yearning had almost overwhelmed him.** When Riley had sat on the witness stand, he'd wanted to turn to the jurors and say, 'See? This man is lying now.' . . .
> **Schlichtmann wanted the jurors to understand the case as he did."** A Civil Action, at 371-72.

The referenced statement, in context, necessarily conveys Schlichtmann's opinion that Riley had lied on the witness stand,

19

an opinion Schlichtmann yearned to share with the jurors, in an effort to persuade them that it was true. However, the reader, like the jury, is left to come to his or her own conclusion as to the opinion's truth or falsity. The bases for Schlichtmann's opinion, and his lack of sufficient evidence to prove it, are detailed in the preceding chapters. A reasonable reader could not interpret Statement J as an assertion of fact, provable by facts known to Schlichtmann, or Harr, but not disclosed to the reader.

Statement G

Statement G is also protected opinion, largely of the "rhetorical hyperbole" type. To put the statement in context, one must appreciate that it is made after Riley's first day of testimony at trial. Schlichtmann's examination of Riley did not go as well as he had hoped, and he and his colleagues are back in the firm's conference room, strategizing how to handle the next day's testimony; how to get Riley to, in their words, "crack." A Civil Action, at 311. Schlichtmann's colleagues urge him to be rougher on Riley:

> G.    "'The jury wants you to kick the shit out of this guy,' said Neville.
> . . .
> [Kiley begins to advise Schlichtmann how to question Riley.] By now, Kiley was shouting. 'You

> get him to say no, no, no!  And then if he says
> yes just once, he'll crack!'
>       Neville jumped up, too, and hovered over
> Schlichtmann from the other side.  'You got to
> manhandle him!' said Neville.
>       'Yeah, great,' said Schlichtmann, his head
> bowed, his voice soft.  'That's good showmanship,
> but I've got to get evidence in.'
>       'My God, this is the guy who killed your
> kids!' yelled Neville.  'You should be attacking
> him with a fucking baseball bat!  You shouldn't be
> asking him' - Neville adopted a mincing tone -
> 'And then what did you do next, Mr. Riley?'
>       . . . [Schlichtmann remains despondent while
> his colleagues continue to coach him.]
>       Then Kiley took a deep breath and sat down.
> He gave Schlichtmann a puzzled look.  'In my
> eleven years of trial experience, you've got more
> shit to use on this guy than I've ever seen
> before.  You can fucking destroy him.  What does
> it take to get you mad?'" <u>A Civil Action</u>, at 310-
> 11.

The Supreme Court has held that the First Amendment
precludes finding defamation liability based upon a statement
that "even the most careless reader must have perceived . . . was
no more than rhetorical hyperbole, [or] a vigorous epithet" not
purporting to state the literal truth.  <u>Greenbelt Coop. Publ'g
Ass'n, Inc. v. Bresler</u>, 398 U.S. 6, 14 (1970).  The use of
hyperbolic language itself signals the reader that the statement
is not to be taken as fact.  <u>See</u> <u>Partington</u>, 56 F.3d at 1157
("The defendant's use of hyperbolic language strongly suggests
that the movie character was not making an objective statement of
fact.").  The context in which the statement was made is also

21

relevant: "[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made . . . [under] circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole." Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980)(internal quotation marks omitted).

The circumstances surrounding statement G place it well within the First Amendment's protective reach. The attributed statement was made during the course of a contentious legal battle. Its immediate purpose, readily understood in the context in which Harr placed it, was to "get [Schlichtmann] mad," to incite him to "manhandle" Riley on the witness stand, by portraying his potential responsibility for dumping harmful chemicals in exaggerated terms. A Civil Action, at 311. Harr sets the dramatic tone by describing Kiley and Neville as shouting and yelling; their comments are punctuated by exclamation points, their language peppered with expletives. Neville's reference to Riley as the "killer" of plaintiffs' children, evoking images of wanton murder, was an obvious use of "fiery rhetoric," Information Control Corp., 611 F.2d 784, to persuade Schlichtmann to question Riley more aggressively (and effectively) on his second day of testimony. The challenged

22

statement, in context, would not be understood by a reasonable reader as a statement of provable fact.

Statement H

Statement H appears on the next page of the book. As Schlichtmann and Conway, his partner, are leaving the office together that night, Schlichtmann asks whether he should have been "more haranguing" in his examination of Riley. A Civil Action, at 312.

> H. **"Conway looked thoughtful but he didn't answer directly. 'Riley surprised me today,' he said. 'He came off looking better than he should have. He was so arrogant and combative in his deposition.'**
> 'He's a liar but he's not stupid,' said Schlichtmann." A Civil Action, at 312.

Whether viewed as merely "a vigorous epithet" made in the course of a heated controversy, Greenbelt Cooperative Publishing Ass'n, Inc., 398 U.S. at 14 (1970), or as a statement of Schlichtmann's opinion, made "on the basis of the limited facts available to him," Partington, 56 F.3d at 1156, Schlichtmann's characterization of Riley as a liar is, in context, nonactionable as either, for the reasons explained above.

23

<u>Statement I</u>

Statement I, taken in context, represents Schlichtmann's conjecture as to why Riley answered a question on the witness stand in the manner he did.  Schlichtmann was questioning Riley about records of chemicals used at the tannery prior to 1979, records that Riley testified had been destroyed.

> **"'Mr. Riley, when did you destroy those records?'**
> **The tanner was instantly enraged.  The question worked just as Schlichtmann had hoped.  In a loud, angry voice, Riley said, 'I don't know when those records were destroyed, but I will repeat to you, sir, again and again, we never used trichloroethylene -'**
> **'No, no, no,' interrupted the judge.  'You're not being asked that.'"**  <u>A Civil Action</u>, at 314-15.

Talking with his colleagues Conway and Charles Nesson afterward, Schlichtmann exults in his perceived success in getting Riley to crack.

> I.  **"'It was great, wasn't it, Charlie!  Why would Riley immediately make the connection between TCE and destroying records?**  Because he was covering up!  **The jury understood that, didn't they?'"** <u>A Civil Action</u>, at 315.

The comment "Because he was covering up" unquestionably presents Schlichtmann's speculation based on imperfect knowledge. All the facts then known to Schlichtmann - that Beatrice's land contained TCE, that Riley denied using TCE at the tannery, and that when asked about destroying records of chemicals used at the tannery, Riley nonresponsively answered that he had never used

24

TCE - are disclosed to the reader.  While it was Schlichtmann's opinion and conclusion that Riley spontaneously made a connection between the tannery records and TCE because he was "covering up," a reasonable reader would fully understand that the statement does not convey that Schlichtmann knew as fact that Riley was covering up, but merely that that "had to be" the reason for his nonresponsive answer (i.e. "had to be" in Schlichtmann's opinion).  A person's motives "can never be known for sure (even by [the person himself]) and anyone is entitled to speculate on a person's motives from the known facts of his behavior."  Haynes, 8 F.3d at 1227.  Accordingly, statement I is nonactionable opinion.

Statement K

Statement K relates to information Schlichtmann got from Lawrence Knox, a well driller Yankee Engineering engaged to drill monitoring wells at the tannery:

> **At the tannery job, he'd just finished drilling one of the wells and was killing time, having a smoke, standing at the edge of the tannery property and looking across the Aberjona marsh, when his attention had been drawn by the sound of machinery operating down there.  Looking down the slope to the fifteen acres, Knox had seen a backhoe moving earth, placing soil and debris into a one-ton dump truck.  Over the next several days, maybe as long as a week, this operation had continued.  Knox had recognized the workers as men from the tannery, but he knew none of their names.**

25

**When the truck was filled, the workers had covered it with a canvas top and driven off the fifteen acres. Where they'd gone, Knox didn't know.** <u>A Civil Action</u>, at 470.

Knox's description of the soil being removed sounded to Schlichtmann like a sample of contaminated soil, referred to as "Sample Z," that he was convinced was tannery waste. In statement K, Schlichtmann offers his interpretation of that information:

K.     "**Back in the car, Schlichtmann told Conway,** 'We've opened the box and the worms are starting to crawl out. This isn't just hiding evidence, this is destroying evidence.'" <u>A Civil Action</u>, at 470.

Defendants argue that statement K is not actionable because it discloses Schlichtmann's subjective opinion, expressed in the form of rhetorical hyperbole. This statement is somewhat more difficult to neatly categorize as either protected opinion or actionable assertion of fact. Strictly speaking, the statement declares the activity observed by Knox to be the destruction of evidence, assuming the removed soil was contaminated by TCE – an assumption Schlichtmann was obviously making. Statement K, in context, is an expression of Schlichtmann's opinion, based on his interpretation of facts fully disclosed to the reader, i.e. that the soil was contaminated, like Sample Z, and was being removed ("destroyed") to prevent its discovery. That view invites application of the doctrine holding that "when a speaker outlines

26

the factual basis for his conclusion, his statement is protected by the First Amendment." <u>Partington</u>, 56 F.3d at 1156.

In any event, considering the book as a whole, and its general subject matter, statement K is not actionable. As noted previously, the book describes a contentious legal battle arising from the contamination of a public water supply and the extremely serious public health consequences allegedly tied to that contamination. The lawsuit, the contamination, and its possible public health consequences are all matters of public concern. And, Harr acknowledges alternative explanations and interpretations of a number of the events described, including the events to which statement K refers. For instance, Harr reports that the driver of the loader used to remove the questioned material testified that "[h]e had dug a path through some underbrush to clear the way for a monitoring well" and "had removed nothing unusual." <u>A Civil Action</u>, at 477. Both the driver's testimony and that of the engineer who directed the well to be drilled reported that only trash, scrap metal, and a small amount of soil not resembling tannery waste, were removed. <u>Id</u>. Harr also notes that the trial judge "found that the 'removal activity' on the fifteen acres 'was legitimately connected to the drilling of test wells and other investigative procedures.'" <u>Id</u>. at 484.

Whether, as defendants argue, Harr's treatment of this particular issue was "even-handed," is of course not critical. (Defs.' Br. at 38.)  The author is entitled to, and does recount the post-trial events largely from Schlichtmann's point of view, leading the reader to follow Schlichtmann's personal journey and also conclude that the wrong result was reached in the case against Beatrice.  See, e.g., A Civil Action, at 491 (noting in the final pages of the book that the EPA's "studies all proved that Beatrice's land was responsible for contaminating the aquifer").  Nevertheless, Harr's interpretive presentation of the events at issue fall well within the scope of protected opinion. "When, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his personal perspective about some of its ambiguities and disputed facts, his statements should generally be protected by the First Amendment."  Partington, 56 F.3d at 1154.

For the reasons discussed above, statements C, E, F, G, H, I, J, and K are statements of opinion protected by the First Amendment, and do not provide grounds for a defamation suit. Accordingly, defendants' motion for summary judgment as to Count III is granted with respect to those statements.

The "of and concerning" Requirement - Statement D

"It is necessary that the recipient of the defamatory communication understand that it is intended to refer to the plaintiff." Restatement (Second) of Torts § 564 cmt. a (1977). Defendants contest statement D on grounds that it cannot possibly defame Riley because it is not "of and concerning" him. Statement D appears in Harr's account of a conversation with Ruth Turner (a pseudonym), an elderly neighbor of the tannery whom Schlichtmann's private investigator located:

> **"Her husband, Paul, would often walk down behind the house, in the forest by the Aberjona River, on the land owned by Riley. He would return from his walks and tell her about the barrels and piles of debris he'd seen there, and how sludge waste from the tannery would flow down the hill and onto the land. In the years before Paul's death in 1981, recalled Ruth, he often awoke in the middle of the night. On several occasions, he'd told Ruth about hearing the sounds of trucks at two or three o'clock in the morning. He said that he could see the headlights of flatbed trucks full of barrels driving up the access dirt road onto the fifteen acres.** 'They're dumping stuff in the middle of the night,' Ruth recalled his saying." A Civil Action, at 188.

While defendants are correct in pointing out that nothing in the statements attributed to Ruth Turner explicitly tied Riley to the alleged dumping, that is certainly the connection Schlichtmann wanted to make, and perhaps one that Harr intended to suggest by the context in which the account is placed. In the preceding paragraph, Harr wrote that Schlichtmann "began looking

29

for the residents who had complained to the health department about the tannery odor.  Some of them, he hoped, might have seen Riley's trucks dumping waste and drums of chemicals on the fifteen acres."  A Civil Action, at 187.  A reader could plausibly suspect, from the entire passage that Riley ("they") secretly dumped contaminated waste on his own land, but that conclusion would involve drawing one set of inferences over another.

However, the author's intimation must be read as that, an intimation, possible inference to be drawn, a conjecture, or speculation.  The question before the court is whether the "challenged language . . . reasonably would be understood to declare or imply provable assertions of fact."  Phantom Touring, 953 F.2d at 727 (emphasis added).  Taken in context, statement D could not be reasonably understood as an assertion of verifiable fact.  To the contrary, the statement recounts an ambiguous comment[10] about observations made more than four years earlier by a witness who had since died.  Neither the general inference

_____

[10]The comment itself refers to the dumpers only as "they[]." Moreover, the preceding passage conveys only that Paul Turner, according to his wife, heard and saw trucks carrying barrels to the fifteen acres in the middle of the night.  There is no indication that Paul Turner was able to identify the trucks as Riley's, a significant point given that the book also discloses that Riley's counsel maintained that Riley himself was the victim of an unknown "midnight dumper."

30

drawn by Paul ("They're dumping stuff") nor the secondary inference to be drawn ("They" are Rileyco) "declare or imply provable . . . fact[s]." Phantom Touring, 953 F.2d at 727. Moreover, Harr later reveals that even at the time of trial "Schlichtmann did not have eyewitnesses who could implicate John J. Riley in the contamination of the fifteen acres." A Civil Action, at 298.

The comment attributed to Paul Turner is quite like the "rumors and accusations" at issue in Brian v. Richardson, most of which, the court noted, had been "identified in the article as mere 'claims' that had been made by identified and unidentified sources." Brian, 660 N.E.2d at 1131. As in Brian, the relevant context "made it sufficiently apparent to the reasonable reader" that the "specific charges about plaintiff [as reflected in statement D] were allegations and not demonstrable fact." Id. Accordingly, statement D is not actionable, and defendants are entitled to summary judgment on Count III as to that statement as well.

Substantial Truth and Fair Report - Statement A

Defendants argue that statement A is nonactionable under the doctrine of substantial truth and the fair report privilege. Under New Hampshire law, an allegedly defamatory statement "is

31

not actionable if it is substantially true." <u>Simpkins v. Snow</u>, 139 N.H. 735, 740 (1995). In addition, New Hampshire law recognizes the fair report privilege, which provides that "[t]he publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts § 611 (1977); <u>see Hayes v. Newspapers of N.H., Inc.</u>, 141 N.H. 464, 466 (1996)(adopting privilege and quoting Restatement). The report need not be a verbatim account of the proceeding; "rather, it need give only a rough-and-ready summary that is substantially correct." <u>Hayes v. Newspapers of N.H.</u>, 141 N.H. at 466 (internal quotation marks and brackets omitted).

Statement A asserts, as a fact, that Riley was found by Judge Skinner, the presiding judge in the underlying suit, to have committed perjury:

A.     "The judge found that Riley had committed perjury and
       that Mary Ryan was guilty of 'deliberate misconduct' in
       failing to give Schlichtmann the Yankee report."
       <u>A Civil Action</u>, at 483.

Defendants concede that "Judge Skinner did not technically find [that] Riley committed perjury." (Defs.' Br. at 45.) They argue, however, that Harr's description of the judge's finding is

32

substantially true or an accurate and fair abridgment of what the judge did find.  The court agrees.

Judge Skinner's specific findings regarding the Yankee and GEI reports are as follows:

> In his testimony on deposition and at trial Riley denied the existence of these reports.  With respect to each question, taken separately, the answer might be justified because of hypertechnical interpretations of the questions posed by the interrogator.  (For instance, "Did you test the sludge?"  Answer[:] "No."  Fact: He caused a test to be made by someone else.)  Similarly one could quibble over the definition of the documents.  There were enough such questions, however, so that any fair response should at one time or another have revealed the existence of these reports.  In addition, Mr. Riley denied the existence of laboratory reports and chemical formulas which were clearly called for.  Even allowing for Mr. Riley's apparent unsophistication and inarticulateness, I conclude that the pattern of evasive answers concerning these reports and the other documents by Mr. Riley requires a finding that the concealment was deliberate.

Anderson v. Beatrice Foods Co., 127 F.R.D. 1, 5 (D. Mass. 1989).

Courts have generally recognized that "a journalist's report need not describe legal proceedings in technically precise language."  Ricci, 574 F. Supp. at 1567.  Certainly, experience teaches that requiring more of lay journalists, who are generally uneducated in the law, would be unrealistic.  Thus, the court in Orr v. Argus-Press Co., 586 F.2d 1108 (6th Cir. 1978), held that an article reporting plaintiff's indictment on various state securities law violations, including making false statements to

33

investors, did not defame plaintiff by using the words fraud and swindle. The court found that "fraud" was an accurate term to describe securities law violations and that "[w]hile the word 'swindle' may imply more serious wrongdoing than was involved here, the word is frequently used in colloquial speech as a substitute for 'defraud.'" Id. at 1112. See also Karp v. Hill and Knowlton, Inc., 631 F. Supp. 360, 364 (S.D.N.Y. 1986)("Thus, even when the term fraud is not part of the judicial record, the courts will permit its use if it fairly characterizes some aspect of a judicial proceeding."). Citing a number of similar rulings, the court in Ricci observed that the cases "indicate that courts hearing defamation claims are to apply a common sense standard of expected lay interpretation of media reports of trials, rather than inquiring whether a report was strictly correct in defining legal charges and describing legal rulings." Ricci, 574 F. Supp. at 1567.

"Perjury", as recent historical events have emphasized, is a legal term of art. But it is also a term used in everyday conversation. The American Heritage Dictionary (2d college ed. 1982) defines the word as "[t]he deliberate, wilful giving of false, misleading, or incomplete testimony under oath." (To constitute legal perjury, however, the false statement must be "material" as well.) From a lay reader's point of view, that

34

definition fairly well covers Judge Skinner's findings.  Taking

that definition as a fair measure of the general reader's

understanding of the term, Harr's use of the word perjury is not

an unfair characterization.  And, even under a more precise legal

understanding of the term, perjury is not a substantially

inaccurate description of Judge Skinner's assessment of Riley's

conduct.[11]  Although the United States Supreme Court has held

that a witness may not be "convicted of perjury for an answer,

under oath, that is literally true but not responsive to the

question asked and arguably misleading by negative implication,"

Bronston v. United States, 409 U.S. 352, 352-53 (1973), a number

of federal appellate courts have found the Bronston rule

inapplicable where the witness has given a responsive answer to a

question he should reasonably have understood.  See, e.g., United

States v. DeZarn, 157 F.3d 1042, 1047-48 (6th Cir.

1998)(distinguishing Bronston where defendant's answer was not

---

[11]The federal perjury statute, for example, provides, in
part:
> [Whoever,] having taken an oath before a competent
> tribunal, officer, or person, in any case in which a
> law of the United States authorizes an oath to be
> administered, that he will testify . . . truly, . . .
> wilfully and contrary to such oath states . . . any
> material matter which he does not believe to be true
> [is guilty of perjury].

18 U.S.C.A. § 1621 (West 1984 & Supp. 1999).

35

unresponsive).  Thus, the Sixth Circuit has held that "a defendant may be found guilty of perjury if a jury could find beyond a reasonable doubt from the evidence presented that the defendant knew what the question meant and gave knowingly untruthful and materially misleading answers in response." DeZarn, 157 F.3d at 1044.

Judge Skinner cited testimony by Riley that was, without ambiguity, responsive to the question asked: "'Did you test the sludge?'  Answer[:] 'No.'" Anderson, 127 F.R.D. at 5.  In finding that Riley's concealment of the documents was deliberate, Judge Skinner necessarily, albeit by implication, found that Riley fully understood the questions he was asked.  Thus, the court finds that statement A adequately conveys a "rough-and-ready summary [of Judge Skinner's findings] that is substantially correct," Hayes v. Newspapers of N.H., 141 N.H. at 466 (internal quotation marks and brackets omitted), and that it is therefore not actionable.  Defendants are entitled to summary judgment on Count III as to statement A.

Defamatory Meaning Requirement - Statements B and L

Defendants contend that plaintiffs' claims with respect to statements B and L must be dismissed because those statements are not capable of defamatory meaning.  To be considered defamatory

36

under New Hampshire law, a statement "must tend to lower the plaintiff in the esteem of any substantial and respectable group, even though it may be quite a small minority." Duchesnaye v. Munro Enterprises, Inc., 125 N.H. 244, 252 (1984)(internal quotation marks omitted). On a motion for summary judgment, that standard is applied "to determine whether the language in question could reasonably have been read to defame the plaintiff." Id.

Riley argues that statement B portrays him as a "villain" and charges him with the crimes of criminal trespass, assault and battery. (Pls.' Br. at 22.) Defendants, on the other hand counter that "[c]ourts frequently dismiss claims where the contested statements are merely unflattering or offensive," and argue that while statement B "may be potentially embarrassing," it is not defamatory. (Defs.' Br. at 40, 41.) Statement B relates the following event:

> B. "He had once confronted a neighbor who had written an article about the tannery stench for the Civic Association Newsletter. Banging on the neighbor's door one evening, he had stomped uninvited into the living room, put his thick finger to his neighbor's chest and yelled that he, Riley, was a big taxpayer in the city, and by what right did the neighbor slander his business in such a manner? The neighbor, at first taken aback by the verbal tirade, finally told Riley to get out of his house." A Civil Action, at 91-92.

37

Defendants compare statement B to a statement at issue in Liberman v. Gelstein, 605 N.E.2d 344 (N.Y. 1992). There, the complaint alleged that the defendant had said, in the presence of others, "'Liberman threw a punch at me. He screamed at my wife and daughter. He called my daughter a slut and threatened to kill me and my family.'" Id. at 346. Finding that "[h]arassment is a relatively minor offense in the New York Penal Law - not even a misdemeanor - and thus the harm to the reputation of a person falsely accused of committing harassment would be correspondingly insubstantial," the court ruled the statements to be nonactionable. Id. at 348.

Defendants argue that because statement B describes an encounter substantially less serious than that considered in Liberman, it too cannot be actionable. However, defendants misinterpret Liberman. There, the court was addressing an alleged slander for which plaintiff had not pled special damages. Unless an allegedly slanderous statement falls within one of the recognized exceptions (which are referred to as constituting slander per se), it is not actionable without allegation and proof of special damages. See id. at 347. After examining the recognized exception for accusations of serious crime, the court noted that "the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are

38

actionable without proof of special damages." Id. at 348. It is in this context that the court, noting that harassment is a relatively minor criminal offense, held the statement at issue to be nonactionable. Id.

In contrast, statement B, if defamatory, does not constitute slander, but libel. See Restatement (Second) of Torts § 568 (1977)(in general, defamatory matter is libel if written or printed and is slander if spoken). A cause of action for libel, unlike one for slander, does not require that special damages be alleged or proved. See, e.g., Richardson v. Thorpe, 73 N.H. 532, 534 (1906). Thus, Liberman is not helpful.

While under New Hampshire law "[t]he fact that [a] phrase is not a complementary one does not automatically make it a libelous one," Catalfo v. Shenton, 102 N.H. 47, 49 (1959), the threshold of defamatory meaning on a motion for dismissal or summary judgment does not appear to be high. See, e.g., id. at 50 (article referring to plaintiff as a "'pig-in-the-parlor'" was capable of defamatory meaning). Statement B could reasonably be read to portray Riley as an unsavory, hot-tempered, aggressive, and perhaps even violent character. The court cannot say as a matter of law that such characterizations would not "tend to lower the plaintiff in the esteem of any substantial and respectable group." Duchesnaye, 125 N.H. at 252 (internal

39

quotation marks omitted); cf. Powell v. Monitor Publ'g Co., 107 N.H. 83, 86 (1966)(libel action for article that plaintiff claimed accused him, inter alia, "of being intemperate to such a degree that his hatred and desire for revenge so controlled him that his own petty motives would prevail in all instances over the rights of his fellow man" survived motion to dismiss). Thus, defendants' motion for summary judgment on Count III is denied as to statement B.

Statement L describes Riley's conduct and personal situation during the post-trial proceedings.

L.     **"Riley returned to the courtroom in early March, three years after first taking the witness stand during trial. Back then, he'd been aggressive and antagonistic, but now he looked sickly, moody, and listless. He paced in the corridor, eyes narrowed and suspicious, mouth tightly compressed.** He was in his mid-sixties, suffering from episodes of depression." A Civil Action, at 480.

Defendants first contend that the statement is nonactionable opinion. They also assert that because the term "[d]epressed can mean anything from 'sad and gloomy' to 'suffering from clinical depression,'" the statement is too vague to be actionable. (Defs.' Br. at 39.)

The statement might plausibly be read, in context, as simply Harr's conjecture, based on his personal observations of Riley "look[ing] sickly, moody and listless," A Civil Action, at 480,

40

that Riley was depressed.  The court also agrees that the term "depressed" is somewhat vague.  Harr later discloses, however, that Beatrice's lawyer, Jerome Facher, "would have liked to bring out the fact of Riley's depression in defense of the tanner's mental confusion and failures of memory, but Riley had told him, 'I don't want to talk about that.'"  A Civil Action, at 482. That additional disclosure supports two inferences.  First, a reasonable reader could understand that Harr had probably learned of Riley's depression, of whatever variety, from a reliable source (i.e., Beatrice's attorney).  Thus, statement L must be taken as an assertion of verifiable fact – either that Riley was actually suffering from episodes of some type of depression (whether or not actually clinically diagnosed) or that Riley himself had at least acknowledged his own belief or understanding that he suffered from "episodes of depression."

In addition, that Beatrice's attorney would use Riley's depression to explain his confusion and lapses of memory to the court, suggests that Harr was using the term to mean something more than just "sad and gloomy."  While the term is still not precise, a reasonable reader would understand that Harr used it to denote a condition of some seriousness, whether it qualified as "clinical depression" or not.  Thus, the court cannot rule, as a matter of law, that statement L is nonactionable opinion.

41

Defendants contend that the statement is still not actionable, however, because it is not defamatory. They argue that in this "day and age, there is nothing shameful about being depressed." (Defs.' Br. at 42.) Defendants' own exhibit undermines their argument. The article, in the March 8, 1999, issue of U.S. News & World Report, quotes one sufferer of depression as saying: "'There is a sense of shame that goes with depression . . . I guess that's why I waited so long [to seek treatment].'" Joanne M. Schrof and Stacey Schultz, Melancholy Nation, U.S. News & World Report, March 8, 1999, at 58 (Ex. 9 to Defs.' Br.). The article also suggests that advances in knowledge may "help to erase much of the stigma surrounding depression." Id. at 60. The court is not prepared to hold, as a matter of law, that the perceived social stigma associated with diagnosable depression, however irrational and ignorant, has already been eradicated. Therefore, defendants' motion for summary judgment on Count III is denied as to statement L.

Intentional Infliction of Emotional Distress

Defendants argue that plaintiffs cannot maintain a claim for intentional infliction of emotional distress that is based on the same statements underlying their defamation claim. The court agrees. "New Hampshire law does not recognize a cause of action

42

for wrongful infliction of emotional distress where the factual predicate sounds in defamation." DeMeo v. Goodall, 640 F. Supp. 1115, 1116 (D.N.H. 1986). Therefore, defendants' motion for summary judgment as to Count I is granted.

Invasion of Privacy - Public Disclosure of Private Facts

Defendants similarly argue that Count IV fails because there is as yet no cause of action for public disclosure of private facts under New Hampshire law. The New Hampshire Supreme Court has, however, at least implicitly recognized the tort. The Court first recognized a cause of action for invasion of privacy in Hamberger v. Eastman, 106 N.H. 107 (1964). Noting that there were actually four separate torts falling within the invasion of privacy category, the court limited its consideration to the first - "intrusion upon the plaintiff's physical and mental solitude." Id. at 110.

Nevertheless, the court recognized the doctrine encompassing the tort alleged here: "'[A] person who unreasonably and seriously interferes with another's interest in not having his affairs known to others . . . is liable to the other.'" Id. at 111 (quoting Restatement of Torts § 867). The court further noted that such unreasonable interference occurs, for instance, "'where intimate details of the life of one who has never

43

manifested a desire to have publicity are exposed to the public.'" Id. (quoting Restatement of Torts § 867 cmt. d). Thus, this court finds that the New Hampshire Supreme Court would recognize, if it has not already implicitly done so, a cause of action based upon the public disclosure of private facts.[12]

Defendants next argue that even if the tort is recognized, plaintiffs' claim must fail where the matter disclosed (Riley's depression) would not "be highly offensive to a reasonable person" and relates to a matter "of legitimate public concern." (Defs.' Br. at 55.) See Restatement (Second) of Torts § 652D. As noted previously, people deemed to be suffering from depression can experience greater or lesser degrees of social stigma, however unwarranted and foolish that may be. It is also hardly apparent, as a matter of law, that a reasonable person would not be highly offended at having it publicly broadcast that he or she suffers from episodes of depression. Cf. Werner v.

---

[12]This tort differs from defamation in that the statement complained of is necessarily asserted to be true; the injury stems from publication of a true but private matter. See Restatement (Second) of Torts § 652D, Special Note on Relation of § 652D to the First Amendment to the Constitution. Because, as noted previously, substantial truth is a defense to a defamation claim, plaintiffs obviously cannot prevail on both the defamation claim and the public disclosure claim with respect to statement L. As plaintiffs are, however, entitled to plead alternative causes of action, the court addresses each claim separately.

<u>Kliewer</u>, 710 P.2d 1250, 1256 (Kan. 1985)(noting that "the disclosure of intimate facts and opinions about [a person's] mental condition would ordinarily be highly objectionable").

Nevertheless, if it is true that Riley suffered episodes of some form of depression, that fact is substantially relevant to the story told in <u>A Civil Action</u>. And, as noted previously, the subject matter of that story - the contamination of Woburn's water supply, its potential adverse health consequences, and the <u>Anderson</u> lawsuit - are all matters of public concern. "[T]he [F]irst [A]mendment protects the publication of private facts that are 'newsworthy,' that is, of legitimate concern to the public." <u>Gilbert v. Medical Economics Co.</u>, 665 F.2d 305, 308 (10th Cir. 1981). Even if the private fact is not itself newsworthy, its publication is still protected if it has "substantial relevance to," <u>id</u>., or "any substantial nexus with a newsworthy topic," <u>id</u>. at 309.

The private fact at issue here meets that test. Riley's assumed bouts of depression (for purposes of analyzing this claim) are clearly connected to the events involved in the <u>Anderson</u> litigation, whether they are viewed as a consequence of those events or, as Facher is said to have thought, a potential explanation for Riley's questionable testimony during the trial. <u>Cf</u>. <u>id</u>. (finding plaintiff's psychiatric and marriage problems

45

"connected to the newsworthy topic by the rational inference that plaintiff's personal problems were the underlying cause of the acts of alleged malpractice").  Thus, because there is a substantial nexus between the private fact at issue and matters of legitimate public concern, defendants are entitled to summary judgment on Count IV as well.

Invasion of Privacy - False Light

In support of their argument that plaintiffs cannot maintain a false light claim, defendants point out that the false light branch of the invasion of privacy tort has not been recognized in New Hampshire.  While that observation is accurate, it is also true that the New Hampshire Supreme Court has never considered a false light claim.  Given its demonstrated commitment to the protection of privacy rights in Hamberger, 106 N.H. 107, it is likely that the New Hampshire Supreme Court would also recognize the false light tort.

However, defendants are generally correct in characterizing this claim as a mere restatement of plaintiffs' defamation claim, but under a different name.  To the extent that is the case, the same constitutional protections noted in the discussion of the defamation claims apply.  See Brown v. Hearst Corp., 54 F.3d 21, 27 (1st Cir. 1995) (where plaintiff's false light claim was

46

"simply a restatement of his defamation claim under a different heading[,] . . . it is not imaginable that it could escape the same constitutional constraint as his defamation claim"). Accordingly, defendants' motion for summary judgment on Count V must be granted as to statements A, C, D, E, F, G, H, I, J, and K, for the same reasons that plaintiffs' defamation claims based on those statements fail.

Defendants also argue that plaintiffs cannot recover more than once, under different legal theories, for the same publication, see Moldea v. New York Times Co., 15 F.3d 1137, 1151, modified in part not relevant at 22 F.3d 310 (D.C. Cir. 1994), a point plaintiffs largely concede (Pls.' Br. at 43 (agreeing that multiple recovery "may be barred").) Plaintiffs, however, may plead alternative legal theories. See Moldea, 15 F.3d at 1151. In addition, while false light and defamation causes of action have much in common, they are not coextensive. See Restatement (Second) of Torts § 652E cmt. b. (Because "[i]t is not . . . necessary to the action for invasion of privacy that the plaintiff be defamed," in some cases the false light tort provides a remedy that would not be available in a defamation action.). Thus, the court will not, at this juncture, dismiss plaintiffs' false light claims with respect to statements B and L.

47

Loss of Consortium

Defendants correctly point out that, except to the extent that she may have a loss of consortium claim, Riley's wife has no standing to sue based on the defamation of her husband. See, Harris v. Webster, 58 N.H. 481, 484 (1878)(husband of slander victim could not be joined as party plaintiff in her suit against slanderer because "an action at law must be brought in the name of the party whose legal right has been affected"). Defendants further argue that because a loss of consortium claim arises as a result of the injuries sustained by the direct victim of the tort, see Brouillard v. Prudential Prop. and Cas. Ins. Co., 141 N.H. 710, 718 (1997), Riley's wife's loss of consortium claim must be dismissed with respect to any of Riley's claims that have been dismissed herein.

Notwithstanding the somewhat confusing terminology used in Brouillard, 141 N.H. at 718 ("loss of consortium is a consequential damage derivative of the original insured's injuries"), the New Hampshire Supreme Court has long held that "[a] wife's cause of action for loss of consortium is created by statute as a separate and distinct claim and is not derivative from the claim of the husband." Reid v. Spadone Machine Co., 119 N.H. 198, 199 (1979). See also Brann v. Exeter Clinic, Inc., 127 N.H. 155, 160 (1985)(holding that because it is not

48

"fundamentally a derivative claim," a "loss of consortium action will not be barred or reduced by a verdict rendered against the plaintiff in a negligence action"). So, this case differs from those in which a claim for loss of consortium has been dismissed along with the underlying defamation claim. See, e.g., Coughlin v. Westinghouse Broadcasting and Cable, Inc., 603 F. Supp. 377, 390 (E.D. Pa.)(holding that where husband's claims for defamation, placement in false light, invasion of privacy, and emotional distress were found nonviable on motion for summary judgment, "[wife's] derivative [loss of consortium] claims must also fall"), aff'd, 780 F.2d 340 (3d Cir. 1985).

Nevertheless, the claims that have failed to survive summary judgment in this action have failed because the First Amendment protects the challenged statements. A successful loss of consortium claim by Riley's wife based on protected speech would infringe First Amendment rights no less than the claims of Riley himself. Thus, the court holds that where Riley's claims are barred by the First Amendment, so too are his wife's related loss of consortium claims.

Enhanced Damages

Defendants argue that plaintiffs' enhanced damages count must be dismissed for failure to state a claim. Under New

49

Hampshire law, however, "a claim for enhanced damages is not a separate cause of action; it is a request for a particular remedy." Minion Inc. v. Burdin, 920 F. Supp. 521, 523 (D.N.H. 1996). Plaintiffs' complaint explicitly alleges entitlement to enhanced compensatory damages based on the "wilful, wanton, malicious and reckless conduct" of defendants, (Am. Compl. at ¶ 49.), which appears to satisfy the pleading requirements of New Hampshire law. See Munson v. Raudonis, 118 N.H. 474, 479 (1978)(recovery of enhanced damages requires "the allegation and proof of wanton, malicious, or oppressive conduct").[13] While it remains to be seen whether plaintiffs will be able to "offer sufficient evidence to warrant an enhanced compensatory damages jury instruction" at trial, Minion, 929 F. Supp. at 526, defendants' motion to dismiss plaintiffs' claim for enhanced damages at this stage of the litigation must be denied.

---

[13]Defendants argue that the enhanced damages "count" must be "dismissed" because plaintiffs have failed to allege any specific acts that evidence ill-will, hatred, hostility or evil motive on the defendants' part. While an award of enhanced damages does require a showing of "ill will, hatred, hostility or evil motive on the part of the defendant," Munson, 118 N.H. at 479, defendants have cited nothing in New Hampshire law that requires a plaintiff to allege, at the pleading stage of the litigation, specific facts evidencing such motives.

<u>Slander</u>

In Count II, Riley alleges that Harr slandered him during an oral presentation at The Firehouse Theater in Newburyport, Massachusetts.  Plaintiffs' amended complaint alleges:

> "[Harr] stated that 'John J. Riley perjured himself at deposition and at trial' and that, among other statements similar to those noted above, had "systematically and illegally deprived Jan Schlichtmann of material of great importance to the prosecution of the <u>Anderson</u> matter.'  Further, Harr stated that John J. Riley had 'lied about the use of certain chemicals used at the John J. Riley Company' and 'concealed essential evidence which would have vindicated Jan Schlichtmann's pursuit of justice.'"

(Am. Compl. at ¶ 21.)

Defendants move to dismiss the slander claim, which is asserted against Harr only, on grounds that the court lacks personal jurisdiction over Harr as to that count.  Specifically, defendants argue that "[u]pon this Court's dismissal of Counts I, III, IV, V, and VI for failure to state a claim upon which relief can be granted, Riley's allegation of slander must be dismissed since this Court will lack personal jurisdiction over Harr." (Defs.' Br. at 58.)  The remainder of defendants' argument is addressed exclusively to whether Harr has sufficient "deliberate[]" contacts with New Hampshire, "aris[ing] out of, or relat[ing] to" the slander claim, to support personal jurisdiction over him in this forum.  <u>Ticketmaster-New York, Inc.</u>

51

v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994).  Plaintiffs'
argument in response is similarly circumscribed.

Neither party, then, has addressed the issue of jurisdiction
under the circumstances now prevailing: that is, where the court
has not dismissed all of the causes of action regarding which
Harr has not contested personal jurisdiction.  Under these
circumstances, Harr's challenge to personal jurisdiction with
respect to Count II implicates the complex and unsettled doctrine
of pendent personal jurisdiction.  Compare Figawi, Inc. v. Horan,
16 F. Supp. 2d 74 (D. Mass, 1998)(disapproving and declining to
apply the doctrine), with Salpoglou v. Widder, 899 F. Supp. 835
(D. Mass. 1995)(exercising pendent personal jurisdiction with
regard to malpractice claim on the basis of actual personal
jurisdiction over defendant with regard to contract claim).  That
doctrine, as applicable here,[14] essentially holds that "where a
plaintiff has established jurisdiction over a nonresident
defendant with respect to one state law cause of action, the
court[] . . . will exercise jurisdiction over that defendant with
respect to related state claims" that would not, on their own,

---

[14]The doctrine is also applied in cases where state and
federal claims are alleged.  See, e.g., Amtrol, Inc. v. Vent-Rite
Valve Corp., 646 F. Supp. 1168 (D. Mass. 1986).

52

support personal jurisdiction. <u>Val Leasing, Inc. v. Huston</u>, 674 F. Supp. 53, 56 (D. Mass. 1987).

If the doctrine were applied here, it would not matter whether the court would otherwise have personal jurisdiction over Harr with respect to the slander claim, standing alone. Because the parties have not briefed the issue it would be premature to consider and resolve it at this juncture. For future reference, however, the parties should note that this court (Devine, J.) has exercised such jurisdiction in a prior case. <u>Anderson v. Century Products Co.</u>, 943 F. Supp. 137 (D.N.H. 1996)(pendent personal jurisdiction exercised with respect to contract claim where court had personal jurisdiction with respect to tort claims). Since defendants' motion to dismiss the slander claim is premised on different circumstances than exist here, and neither party has briefed the potentially dispositive jurisdictional issue in context, the defendants' jurisdictional motion is denied, without prejudice to renewing and briefing it under the applicable standards.

<u>Conclusion</u>

For the foregoing reasons, defendants' motion for summary judgment is granted as to Count I and IV, and, with respect to statements A, C, D, E, F, G, H, I, J, and K, Counts III, V and VI. In all other respects, defendants' motion is denied. If, notwithstanding that Counts III, V, VI, and VII have survived summary judgment in part, Defendant Harr still contests personal jurisdiction as to Count II, he may file a renewed motion to dismiss by May 19, 2000.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 31, 2000

cc:  Peter A. Riley, Esq.
     Lucy J. Karl, Esq.